## FERGUSON & NEILL VS. MOORE & WIFE.

The husband and wife unite in the sale of land, inherited by the wife while a feme sole, and which had been embraced in a schedule filed under the statute entitled " Married Women:" with the money received for the wife's land, the husband purchases slaves, taking a bill of sale for them in the name of the wife and to her sole and separate use: *Held*, that the real estate of the wife, in this case, was not within the provisions of the statute: that upon its sale, the purchase money received was personal property and belonged to the husband; that the slaves were subject to the prior debts of the husband.

Where a schedule of the wife's slaves is filed, as prescribed by the " married women" act, or the amendment thereto, the husband has no such interest in the slaves, or right to their labor, as can be subjected to his debts.

*Appeal from Independence Circuit Court in Chancery.*

Hon. BEAUFORT H. NEELY Circuit Judge.

BYERS, for the appellants.

: We insist that the statutes, *ch.* 104 *Dig.*; *Act of Jan.* 1851, do not change the common law as to the marital rights of the husband in the real estate of the wife. And as the real estate in this case vested in *Derinda,* before the passage of these statutes, that upon her marriage with John M., he became seized of an *estate of freehold* in *her right:* and that upon birth of issue of the marriage, capable of inheriting the estate, he became tenant by the courtesy initiate, and from thence seized of the land as *tenant for life* in his *own right*; and that his estate in the lands was such as would be subject to execution and sale for his debts. *Co. Litt.,* 30, (*a.*) *Lancaster Bank vs. Stanfer,* 10 *Barr.* 398; *Gamble's Estate, select Equity cases by Parsons, P.* 489; *Heard vs. Cass,* 9 *Barb. S. C. Rep.* 369; 2 *Kent. Com.,* 130, 3*d ed.; Sleight vs. Head,* 18 *Barb. S. C. Rep.* 160; *Schermerhorn*

*and Clate vs. Miller and wife*, 2 *Cow.* 439; *Vartie vs. Underwood*, 18 *Barb. S. C. Rep.* 565.

At common law—if the wife joined with the husband in a conveyance of her lands, and he received the money therefor, it became his money in his own right. This, we suppose, will not be controverted. Then if our statute does not change the husband's rights in this respect, when Moore and wife sold the land and he reduced the money to his possession, it became his money, and liable to the payment of his debts; and as it is admitted that he was insolvent, and had no other property out of which the debt could be made, the purchasing by him of slaves, with the money arising from such sale, and which he had reduced to his own possession, and taking the bill of sale of said slaves to his wife as her property—the same was fraudulent and void as to the appellants, who were his creditors at that time. *Wells vs. Treadwell*, 28 *Miss. Rep.* 28; *Warren vs. Brown, et al.*, 23 *Miss. Rep.* 75; *Hopkins vs. Carey et ux., et al.*, 23 *Miss.* 55; *Henderson & Moore et al. vs. Warmack*, 27 *Miss.* 834.

Our statute does not make a *feme covert* a *feme sole* as to her separate property. It has not the effect to extend her power of contracting or binding herself or her property. *Davis et ux. vs. Foy*, 7 *Sm. and Mar.* 67; *Berry vs. Bland, Ib.* 83.

At common law, the gift or conveyance to a married woman of personal property, vested it in her husband, and the slaves in this instance would have been subject to attachment. The question then is, how far our statutes have changed the common law.

The statute is plain and unambiguous, and it appears, from the phraseology of it, that its framers were versed in the principles of the common law as it then stood, and merely intended to enable the wife to take and hold property in her own right, but the usufruct thereof to be the husband's to the same extent as before. It vests the fee simple or absolute property in the wife; but in regard to the labor or hire of the slave, it expressly gives that to the husband, during marriage. He has, therefore, the use of the property during marriage—his wife the

ultimate property. The hire of the slaves—their labor—belongs to him; the mony received is his money, by the express wording of the statute.

The Mississippi statute had been in force seven years before the passage of our statute, and a number of the decisions of the Courts of that State making the product of the labor of the wife's slaves liable to the payment of the husband's debts, were made before the passage of our statute, and it is but a reasonable intendment and interpretation, to say that it was the intention of our Legislature to adopt their statute with the interpretation then given of it, as the law of this State.

Fairchild, for the appellees.

The lands that produced the money paid for Candis and her children, and Adeline, were Mrs. Moore's separate property; she held them exempt from any liability for the debts or contracts of her husband, and I am at a loss to know why the money should not be her money. If kept in *specie*, it is not property that will be exhibited upon which her husband may obtain credit; the possession of it is presumed to be with the title, with the wife; no one has a legal right to presume that it will ever be allowed to be appropriated to the husband's use; no existing creditor has any moral claim upon it; any more than he has upon the land that has been turned into money.

In equity a married woman has the same power over her separate property, that she would, if single, have over her whole estate. *Willard's Eq. Jurisprudence,* 645, 649; *Strong vs. Skinner,* 4 *Barb.* 555, 556; *Dobbin vs. Hubbard,* 17 *Ark.* 194.

In Mississippi, it has been first admitted by implication, and then been expressly decided, that, an investment of the wife's money, with the title taken to her, will make the property conveyed to her, her separate property under the Mississippi statute of 1836, there familiarly called the woman's law. *Hopkins vs. Carey,* 23 *Miss.* 58; *Garrison vs. Fisher,* 26 *Miss.* 354.

And in neither of these cases, is the money that was invested

in the purchase of separate property, alluded to, as being the proceeds of property made separate in the wife, under the Mississippi statute.

In Tennessee it has been decided in a late case that the proceeds of separate property, whether represented by the actual products of labor, or by property purchased therewith, remain separate property. *Young vs. Jones*, 9 *Humph.* 555.

If it were not so, it would be useless to try to secure property to the use and support of a married woman and her children, by the forms recognized for this purpose in equity; and if our position in this case is not correct, our statutes afford no protection to a married woman; she cannot " become entitled to a possession of slaves by conveyance," she cannot hold property conveyed to her by deed, " as belonging exclusively" to her " under the provisions of chap. 104, of the Digest of the Statutes of Arkansas," that " shall not be liable to execution or sale, for the payment of debts of her husband, whether contracted before or after the accruing of the title of the wife. See *Dig. ch.* 104, *S.* 3, *Acts* 8*th, Sess.* 123, *S.* 3.

In Mississippi a note to a wife is held to be her separate property under its married woman law. *Bodgett vs. Ebbing*, 24 *Miss.* 245. All Mississippi authorities in favor of a wife ought to bear very strongly.

There can be no question but that the general object of the married woman's law is to protect married women in the title to, possession, use and enjoyment of such property as comes to them from any quarter, provided it does not come from the husband.

And with regard to slaves, which are the property in controversy, the statute is too explicit to admit of doubt, that marriage shall not operate as a gift to the husband of such slaves as a woman has when she marries, and that if a wife acquires slaves they shall " inure and belong to her;" in both cases the wife " shall have, hold and possess the same as her separate property, exempt from any liability for the debts and contracts of her husband."

How can the object of the statute be obtained, if Ferguson & Neil be allowed to seize, as they did, Mrs. Moore's slaves, for a debt that was made months after she had caused it to be recorded that her husband had no right to them? When her servants are torn from her, does she " have, hold and possess" them? The object of the Statute of 8th December, 1846, is further shown by the amendatory act of 11th January, 1851, which empowered the wife alone to make her schedule, and made a written transfer to the wife, have the same effect as a schedule under the former act.

Every step taken in legislation upon this subject has been to increase the privileges of the wife, to make the protection designed more effectual.

The various decisions in Mississippi. 7 *Sm. & Marsh.* 67, 74, 84; 14 *Ib.* 58; 24 *Miss.* 417, are in direct opposition to the statute, and should not be held as binding authority in construing our statute.

Mr. Justice SCOTT delivered the opinion of the Court.

The following are the more prominent facts of this case, and the statement of them is deemed sufficient for a correct understanding of the points of law to be decided.

William Heath died intestate in September, 1846, in the county of Independence, where he had, for some time before, resided, leaving him surviving his widow and the appellee, Dorinda, his sole heir. He left some lands and a slave named Jerry. It does not appear that the respective rights of the widow and heir were ever severed, and it is to be inferred that they both remained upon the land, and enjoyed the labor of the slave without any such severance. In April, 1848, Dorinda intermarried with the appellee, John M. Moore, who seems to have brought nothing into the marriage. He immediately becoming a member of the widow's family, continued with his wife to reside with his mother-in-law, until the death of the latter, which occurred in July, 1853—she seeming all the time to

have been the head of the family, so far as the property was concerned. During her widowhood she seems to have acquired, in her own right, three additional slaves, to wit: Wyatt, George and Rhoda. Upon the death of the widow the whole of this property seems to have quietly passed to the undisputed possession of Moore and his wife.

On the 22d of May, 1855, Moore and wife filed in the recorder's office of Independence county, a sworn schedule of all this property, claiming the same as separate property of Mrs. Moore, derived from her father and mother's estate.

On the 14th day of July, 1855, one Lewis L. Moore, made certain promissory notes, payable to John M. Moore, which were the same day assigned, by the endorsement of the latter, to Ferguson & Neill. A recovery sought upon these notes against John M. Moore, is the foundation of these proceedings.

On the 10th of December, 1855, John M. Moore and wife sold the land described in the schedule—and therein alleged to have been derived by Mrs. Moore from her father—to one McClelland.

On the 21st of January, 1856, John M. Moore purchased of John Robinson four slaves, *to-wit:* Candis and her two children, and one named Adaline, and took a bill of sale to Dorinda his wife, in terms, as her " own sole and exclusive and separate property, free from the claim or liabilities of her present husband, or any future husband;" and that bill of sale having been regularly acknowledged, was recorded the next day in the county of Independence, where Moore and wife resided. The evidence, also, as to this matter, conduces to prove that the Bank notes paid over to Robinson for these slaves, were a part of the same Bank bills that were received by John M. Moore from McClelland, for the lands sold to him above mentioned.

An attachment having been levied upon the whole of these slaves, as the property of John M. Moore, at the suit of Ferguson & Neill, seeking a recovery upon some of the endorsed notes above mentioned, Moore & wife obtained an injunction.

Ferguson & Neill answered the bill; and also, by way of cross-bill, sought a recovery by decree, not only of the notes already in suit at law, and embraced in the injunction, but also of an additional one, of the same date, that had been partially paid, alleging the utter insolvency of Moore beyond the slaves in question, and that he was about to remove to Texas, insisting that as to the four slaves, Candis and her two children and Adaline, they were subject to Moore's debts absolutely, because when the money, which purchased them, had come to Moore's hands, it became his own, under the general law; and that, as to the other slaves, although they might be within the general provisions of the statute of Married Women, Moore, the husband, had, under the provisions of that statute, such an interest in them as could be subjected to the payment of his debts, and praying that an account might be taken to ascertain the whole amount due to Ferguson & Neill, to be decreed them, and for its satisfaction that the four last mentioned slaves should be sold, and that the other three should be placed in the hands of a receiver, and their annual hire, as it should accrue, applied to the satisfaction of the residue of the amount found unpaid, and for general relief.

In response to the cross-bill, the alleged indebtedness and allegations of insolvency were admitted.

The cause was heard, and the Court decreeing that the cross-bill should be dismissed and the injunction should be perpetuated, Ferguson & Neill appealed to this Court.

No question of jurisdiction has been insisted upon; but the questions argued by the counsel relate to the liability of these slaves for the debts of Moore, the husband.

With regard to the four slaves, Candis and her two children and Adaline, it is insisted that, having been purchased with money which was lawfully the husband's money and not the wife's, they were liable to the husband's debts, previously contracted, although the bill of sale for them was taken to the wife, to her sole and separate use. Supposing the money to have been the husband's, and not the wife's separate property,

25

as is contended, it would follow, of course, that, under the statute of Married Women, she could not acquire the slaves in her own right, under such circumstances, because the statute forbids a gift from the husband to the wife to be held under its provisions. Nor could it be sustained under the old law, otherwise than subject to the prior rights of creditors, because it would be but a voluntary settlement.

It becomes then a material matter, whether or not the money in question was the husband's. It was money received by the husband for lands inherited by the wife, and sold and conveyed by their joint deed. The wife's right and title to the lands had vested in her while she was a feme sole; when she afterwards became a wife, the marital rights of the husband attached to them as those rights were known to the common law, although the statute of Married Women was then in force; because that statute in none of its provisions, extends to such a case. If it had been slaves instead of land, the case would have been different, because the statute provides as to the former, that they shall remain the wife's own property, notwithstanding the marriage; but there is no such provision as to lands of a *feme sole*, owned by her at the time of her marriage. So, there is no pretence that the lands in question were inherited by Mrs. Moore after she became a married woman, so as to raise any question as to rights under the first section of the statute; nor that she held them under any deed, bequest, grant or decree, " expressly setting forth that they were designed to be held exempt from the liabilities of her husband," so as to bring the case within the third section of the Amendment to the statute.

If, then, lands owned by a *feme sole*, at the time of her marriage, were not within the provisions of the statute, it would scarcely be contended that they could be brought within the act, simply by including them in the schedule, which it is requisite the wife shall cause to be filed, in order to obtain the benefits of the act. Nor could the mere concurrence of the husband, in such a schedule, have that effect, because there would be no efficacy in such a concurrency on the part of the

husband, even as to property that might be within the provisions of the Married Woman's law, much less as to property without the provisions. Nor upon general principles could such an act, on the part of the husband, although it might be regarded as evincing the willingness and free consent on his part, that the wife might enjoy her lands upon the terms of the Married Women's law, amount to such a post-nuptial settlement and notice thereof, as would stand, in favor of the wife, against subsequent creditors and purchasers without notice, who, in addition to their equity, might have the law upon their side.

The result is, upon this branch of the case, that the general marital rights of the husband, Moore, having previously attached to the lands, and being unimpaired, either by any of the provisions of the statute of Married Women, or by any post-nuptial settlement upon his wife, binding upon creditors, when they were sold and conveyed by the joint deed of Moore and wife, the purchase money received therefor by Moore became personal property, and belonged absolutely to him. (See the case of *Crosby vs. Otis*, 32 *Maine R.*, *p.* 259, *and the authorities there cited*.) And the four slaves purchased with a part of this money and settled upon his wife by the bill of sale from Robinson, to her sole and separate use, are subject to such of his debts as were contracted prior to this settlement, which the law deems a voluntary one, and void as to prior creditors, to which class the pleadings and evidence in this case show the appellants to belong.

And hence, too, the doctrine contended for by the counsel for the appellee, that the right of property, in a married woman, attaches to the fund arising from the sale of her sole and separate estate, to the same extent which existed in regard to the property before the sale, although, doubtless, sound in itself has no application to this branch of the case, because here, as we have seen, the wife had no sole and separate property in the lands in question.

With regard to the other four slaves, *to-wit:* Jerry, Rhoda

Wyatt and George, it is conceded that they were embraced within the statute of Married Women; and as the required schedule had been filed prior to the making of the debts proceeded for, it is insisted that only the husband's interest in them, whatever it may be, under the *operation of* that law, shall be subjected to these liabilities of his: And that, according to that operation upon the otherwise common law rights of the husband, he has, *first*, an absolute right to the usufruct of the slaves during his own life—like an estate by the courtesy in his wife's lands at common law—and that that, consequently, may be subjected to his debts: *secondly*, that although the usufruct would pass to the wife upon the death of the husband, she surviving, to be enjoyed by her during her life, nevertheless, that at her death the absolute interest in, and title to, the slaves would pass to the distributees of the husband, as it would have passed directly to him upon her death during the coverture, had he survived her; and, consequently, that this ultimate absolute ownership of the slaves by the husband, subject only to the usufruct of them by the wife, from the time of her husband's death, should she survive him, until her own death, may also be subjected to his debts.

It is not to be denied but that both of these propositions have substantial support in the decisions of the Supreme Court of Mississippi, if they should be applied as the rule of interpretation. And it is insisted, that so far as these decisions had been made previous to the enactment of our statute, it ought to be taken that our Legislature intended to adopt them as the rule of interpretation, because our statute, in most of its provisions, is very nearly a literal copy of the statute of Mississippi, approved the 11th February, 1839, on the same subject. It is true that our statute was passed upwards of seven years after that in Mississippi, and is, in many respects, identical with it. The chief points of difference, as to the two acts, consist in a provision of the Mississippi act, which is not contained in ours, which is to the effect, that upon the death of the wife her slaves shall go to the children of her and her husband, jointly

begotten, and in case there shall be no child born of the wife during coverture, then the slaves to go to the husband and his heirs. (2 *Bright on Husband and Wife, p.* 675 and 676, where the Mississippi statute is copied); and in the provision contained in ours providing for the schedule, which is not contained in the Mississippi statute. In other respects there is no material difference in the phraseology of the two statutes.

It is, doubtless, proper enough, when a statute has received a settled and well known interpretation in one State, and a like statute should be adopted in another, to assume that the Legislature of the latter meant to adopt, as well the interpretation that the statute had received, as the phraseology in which it was expressed. The settled interpretation of the law is the law itself. But it will scarcely be said that there had been any settled interpretation in Mississippi, that had become notorious in this State at the time our statute was passed. So far from this, the litigation which grew out of that statute could hardly be said to have then commenced, so great is its disproportion to that that has since made its appearance in the courts of that State, whose decisions had to settle the interpretation. Besides, about one year before the passage of our act, the 4th and 5th sections of the Mississippi act had been repealed, and a new enactment had been passed greatly extending the law for the protection and preservation of the rights of married women.

But although we do not, in the least, feel bound to be governed, in our determination upon any question arising out of our statute, by the decisions of the Supreme Court of Mississippi, we have looked into these decisions, with the utmost respect, to enlighten our judgment. And we regret to find it impossible to approve their general current as presenting a sensible rule for the interpretation of our statute, although so materially like the original statute, of that State. Far less bold and innovating than the strong terms of the statute authorize, they utterly fail, as we think, to reflect its true spirit. Trimming and vacillating between two systems, distinct enough in the law, but altogether antagonistical, they strike first for one,

and then for the other, and on either hand sow broadcast the seeds of litigation. The married woman all the while the sufferer, her interest neglected, and her rights withheld or reluctantly admitted, her husband, ultimately, getting her negroes—which the Legislature had said she should "hold and possess as her separate property"—by the double title of the act that was, nominally, passed for her benefit, and the old law of husband and wife, which, these decisions maintain, is, in no respect, absolutely repealed, but only suspended. In other words, so much of the act as gave the wife's negroes to the husband, upon her death, if no child had been born during the coverture, was held to give nothing to the husband that he did not already have, upon the idea that the Legislature was, all the time, carving out of the husband's rights for the benefit of the wife, and never carved out of the wife's rights for the benefit of the husband at all.

It was thus that this rule of interpretation, in effect, made one of the provisions of the statute inoperative, while it was certainly practicable to have adopted another reasonable one, which would have given operative force to them all, and would have far better reflected the obvious spirit of the entire statute. And that is no new born, unknown spirit, but simply the gradually perfecting spirit of civilization, manifesting itself in a new form in the increased tendency of legislation in this country, designed to shelter the wife from misfortune. And there is no truer test of civilization, and of its grade, than the consideration and protection secured to the sex by the laws, under a government like ours, where legislation is so emphatically the reflex of sentiment and opinion. Nor is the mode of this legislation new, either in its letter or its spirit, because it is but a step in that direction, in the increasing process in our affairs, of obliterating the distinction between law and equity.

But while that rule of interpretation had the effect to lop off an inconsiderable member from the body of the Mississippi statute, it would absolutely emasculate ours: because, there being no provision in our statute, as there was in that of Mississippi

for the property to pass, upon the death of the wife, to her chil-
dren, it would go directly to the husband, in virtue of his quoad
suspended marital rights under the old law: and the practical
result would be so much like the mountain in labor, that brought
forth the mouse—and that, too, by such strangely inconsistent
throes, legally speaking—that such a denouement, in view of
the common sense matter of fact means actually employed, is
not to be attributed to an intelligent Legislature.

In the first place, according to the Mississippi rule of inter-
pretation, the husband would have an absolute right to the usu-
fruct of the slaves during his own life—like a perfected estate
in lands: the wife, during the same time, while alive, owning
the dry title in fee. Should she die first, the dry title in fee
would pass to the husband, and uniting with the usufruct would
make his title complete; and so the matter would end, so far
as the statute of Married Women was concerned, children or
no children. On the contrary, should he die first, the usufruct
would pass from him to her for her own life, not however to
unite in her hands with her dry title in fee; on the contrary,
the latter would pass to the distributees of the husband (at the
instant of time that the usufruct passed from the dead husband
to the living wife) there to wait the falling in of the life estate
of the wife, when the title of the distributees of the husband
would be complete; and so again the matter would end, so far
as our statute of Married Women was concerned.

Thus, in any event, the property would ultimately vest in fee
either in the husband, or in his distributees; and in no event
would it vest in the distributees of the wife. And in any event,
the husband would have the usufruct during his own life and
the ultimate fee, either in himself, or his distributees; while the
wife, in no event, could ever enjoy more than the usufruct
during such part of her own life, as might continue after the
death of her husband, and in no event could the ultimate fee
ever reach her, or her distributees.

The practical result would be, as to creditors of the husband,
that by means of this circumlocution, his title to the slaves,

during the lifetime of his wife, would be complete, otherwise than being subject to the usufruct for so much of the life of the wife as might remain after the death of the husband.

Against this interpretation, the statute in express terms, in language that needs no interpretation, because it has a fixed, clear, distinct and settled legal signification, enacts that the wife " shall have, hold and possess the same (the slaves) as her separate property, exempt from any liability for the debts or contracts of the husband." (*Sec.* 2 *of the Statute.*)

If these terms were contained in a deed of settlement, no one would contend that the marital rights of the husband in any way attached to the property conveyed. On the contrary, it would be at once conceded, that according to well settled law, upon the death of the wife, without a disposition of it, it would pass to her distributees, and would not pass to the husband in virtue of his marital rights, if there was no further provision in the deed to that effect. Upon what ground of reason, then, can it rest, than a different rule is to prevail, when the statute makes the settlement instead of the deed? The terms employed negative the marital rights of the husband as effectually, when used in a statute, as when used in a deed.

. So again, if in that same deed, it should be provided that, as to the slaves thus settled to the sole and separate use of the wife, the husband should have the control and management of them, and the direction of their labor, and should take to himself the productions of the latter, who would contend that, according to any rational intendment, the grantor designed to create in him a life estate in the slaves? And who, in any endeavor to ascertain the true intent of the grantor as to the husband, would look beyond the deed to his general marital rights? On the contrary, would it not be obvious that so far as his rights were concerned, they began and ended in the deed? And would it not also be obvious that they were to be considered as subordinate to, and as carved out of the otherwise ample rights secured to her by the deed? Unquestionably so, as we think. Upon what ground of reason, then, can it rest,

that a different rule is to prevail for ascertaining the right of a husband, which grew out of a settlement upon the wife, when that settlement is by statute, and not by deed? Unquestionably, the Legislature have the same right to make a settlement upon the wife by statute, as to property not yet vested in the husband according to the law of his marital rights, or vested in him subject to the right to make such a settlement, that the father of a wife would have, to make a like settlement by deed.

Not only would each have the right to prescribe what property should be settled, but all the terms and conditions of the settlement. And in neither case could the husband complain that his marital rights had been invaded, and abridged thereby, and therefore insist that the terms of the settlement should be strictly construed as against the wife, and liberally in his favor. And this, for the simple reason, that his marital rights had never attached to the subject matter of the settlement at all, and therefore could not have been invaded by it in any degree. And if they had attached subject to the right to make the settlement, the making of it could invade no fixed right of his.

Hence it is to be seen, that the idea, that a marriage settlement of property upon the wife, to which the husband had no right, is in derogation of the marital rights of the husband, is altogether fallacious. Much more, then, is the idea without legal support, that a right secured to the husband, by one of the terms of the settlement upon the wife, is to be enlarged by such a rule, and with this false idea, is to be made to slaughter the settlement itself. The whole theory of the rule proceeds upon false premises. The husband had no marital rights to be invaded. On the contrary, his rights, so far as they exist, begin and end in the settlement, and are created by it, and are limited and defined by its terms and object. The statute, while it leaves untouched the old mode of making a settlement to the sole and separate use of the wife, prescribes a new mode for those who may elect to adopt it, and fixes the terms of the settlement, when made in this new mode. Hence, when the husband claims the right as growing out of the statutory settle-

ment, as to property legitimately within the plan of settlement, that right must be ascertained from the statute itself, which creates the right. In this case the husband—or rather, one of his creditors does for him—claims such an interest in the slaves embraced in this settlement, as should be subjected to the payment of his debts. On the part of the wife that claim is denied; and that is the question that we have to determine.

The terms of the conflicting claims to the slaves, used in the statutory settlement, are, on the part of the wife, that " she shall have, hold, and possess the same (the slaves) as her separate property, exempt from any liability for the debts or contracts of her husband:" while on the part of the husband, they are, that " the control and management of the slaves, the direction of their labor, and the receipt of the production thereof shall remain to the husband agreeably to the laws heretofore in force."

If these two provisions were so repugnant that both could not stand, and that one or the other must fall, we should have to resort to rules of construction to ascertain which of the two should fall. But this is not the case, because both can stand, and have a sensible construction. To a certain extent, they are apparently inconsistent, but not to the whole extent. The wife could not hold and possess her slaves if the husband, or his creditors, could take them away from her, and destroy her possession.

So, in the ordinary acceptation of the terms " control and management of the slaves and direction of their labor," and of the right to " take the production thereof," these could not be enjoyed unless possession of the slaves, in some sense, was with the husband. But the Legislature have forborne to use the term " possession," as connected with the husband's rights as to the slaves, and have used other terms indicating something like it, by words of circumlocution. The inference is, therefore, strong, that the control and management of the slaves, and direction of their labor, and the receipt of the production thereof were to be consistent with the wife's de-

clared possession.    Upon general principles, so long as the wife
lived with the husband, she was a pecuniary charge upon his
hands, although she might be possessed of sole and separate
property, and although by the terms of the settlement, she
might be authorized to reap the rents and profits to her sole
use.    But it was competent for the wife to give these rents and
profits to the husband, and in that case they would be his abso-
lutely.    And in general, it would be equitable that she should
do so, unless she would sustain her personal charges out of her
own income.

If we should suppose, that inasmuch as the Legislature, in
the plan of settlement presented, did not think proper to ex-
empt the husband from his legal obligations to support the wife,
that body thought it equitable that the rents and profits should,
on that account, be given to the husband by the wife, during
the existence of the coverture, we could see a reason for the
provision in question in favor of the husband, and a distinct
meaning for the words " agreeably to the laws heretofore in
force," that is, that to the extent, that rights of the husband were
provided, they were to be as absolute as if they had been
secured by his marital rights, instead of having been secured
in virtue of the statute.

Hence, we adopt a construction as the true one, that the con-
trol and management of the slaves, and the direction of their
labor by the husband, is to be subordinate to, and in unison
with their actual possession by the wife, of which she is not to
be deprived, either by him or his creditors, further than, so far
as he may be concerned, it may be necessary in the control and
management of the slaves, and in the direction of their labor, to
the end that he may reap the production thereof during the cover-
ture, as his absolute property.    These productions of the labor
of the slaves being his absolute property, by means of the
forced gift from the wife to him, imposed upon her by the sta-
tute, they, of course, would be liable to the husband's debts;
but the husband has no such interest in the slaves, or right to

their labor, as to be subjected to his debts, until that labor shall have become tangible in products.

The Chancellor, therefore, committed no error in his action as to the four slaves involved in this branch of the case. But, as he refused to give the appellant relief, so far as the other branch was concerned, to the extent of the four slaves involved in that branch, the decree, so far as that is concerned, must be reversed, and the cause remanded with instructions to give so much relief to the appellants, either upon their cross-bill, or by a dissolution of so much of the injunction that was made and perpetuated upon the original bill, as the appellants may elect.